A01A0392. WILLIAMSON v. YANG et al.
A01A0393. YANG v. WILLIAMSON.
(550 SE2d 456)

MILLER, Judge.

Claiming Jan Yang had failed to keep a promise to give Ron Williamson five percent of a newly formed company (Enzymatic Deinking Technologies or "EDT"), Williamson sued Yang and EDT in five counts to obtain the promised ownership shares or to recover damages. The counts were stated as claims for trover, breach of contract, breach of fiduciary duty, fraud, an accounting, and attorney fees. The court directed a verdict in EDT's favor on all counts and in Yang's favor on all counts excepting breach of contract. The jury found in Yang's favor on the breach of contract count, and Williamson appeals in Case No. A01A0392. In Case No. A01A0393, Yang cross-appeals the court's denial of his directed verdict motion on the breach of contract claim.

The questions on appeal are whether (1) the court abused its discretion in certain evidentiary rulings and in refusing to grant a mistrial, (2) the court erred in entering the directed verdicts, and (3) the court erred in refusing to compel the appellees to pay the record costs arising out of their record designations. We answer these questions in the negative and thus affirm in Case No. A01A0392. These rulings moot the cross-appeal in Case No. A01A0393.

Construed in favor of the verdict, the evidence shows that Yang and another scientist, both employed at the University of Georgia, developed certain technology that used enzymes to "deink" paper for

recycling. Williamson, who was counsel for the university, assisted Yang on some personal legal matters and also advised him on how to set up EDT, a corporation that would license the technology from the university and commercialize the process. Williamson claims that in July 1994, Yang orally promised him five percent of EDT in exchange for Williamson's assistance in setting up EDT. He further claims that soon thereafter Yang promised him another five percent if Williamson would help Yang obtain the technology license from the university. Yang counters that no such promises were made, but that he simply told Williamson he would eventually compensate Williamson for his time and advice.

Williamson made a phone call to reserve the corporate name, prepared a one-page sheet setting forth articles of incorporation authorizing one million shares, and commented on proposed confidentiality agreements with third parties. He did not help obtain the license, as he felt such conflicted with the interest of his employer, the university. Using the articles of incorporation and the reserved name, Yang incorporated EDT in September 1994 and issued himself 750,000 shares at $.002 per share. On October 5, EDT obtained the license without the help of Williamson. On October 7, Yang as the sole shareholder amended the articles of incorporation to authorize ten million shares. On October 11, Williamson signed a subscription agreement and received 60,000 shares in EDT at $.002 per share. Even though the share certificate reflected on its face that ten million shares were authorized, Williamson claims that he did not read this information and that he believed he was receiving six percent of the initially authorized one million shares.

EDT was converted from a corporation to a limited liability company in November. Williamson consented to the conversion in a document which had attached to it a conversion plan showing him as owning 0.6 percent of the ten million authorized shares or 1.6 percent of the shares actually issued. He received an equivalent number of units in the limited liability company, which had also authorized ten million ownership units.

Nevertheless, Williamson claims he did not become aware of his ownership percentage until early December, after which he arranged a meeting with Yang. He demanded more shares from Yang, who refused. Williamson drafted a letter for Yang's signature in which Williamson had Yang acknowledge a promise to Williamson of six percent of the authorized shares. Yang refused to sign and was offended by the inclusion of this fictionalized promise, which even Williamson agreed did not reflect the agreement between the parties.

In January 1995 and then February 1996, Williamson sent letters to Yang demanding that Williamson receive an additional 940,000 ownership units for a total of one million or ten percent of

the authorized ten million ownership units. He claimed that Yang had promised him five percent in the summer of 1994 for help in setting up the corporation and had promised him an additional five percent in the early fall for help in obtaining the technology license from the university. Counsel for Yang declined the demands, noting among other things that if Williamson were to receive pay for help in obtaining a license from his state university employer, criminal actions of bribery against Williamson were possible.[1]

In 1998, EDT obtained a patent on the licensed technology. Williamson then sued Yang and EDT on the alleged initial five percent promise.

1. In nine separate enumerations of error, Williamson argues that the court erred in excluding or admitting various pieces of evidence on grounds of relevancy. Williamson objected to much of this evidence in a pre-trial motion in limine, which the court for the most part denied. Of course, even though the admission of marginal evidence is favored, ultimately the admission or exclusion of evidence on grounds of relevancy lies within the sound discretion of the trial court, whose decisions we will not disturb absent a clear abuse of discretion.[2] Our review of the disputed evidence reveals no abuse of that discretion.

(a) The trial court refused to allow a third-party witness to testify about his attempts to negotiate a deal with Yang in June 1994 regarding another way to incorporate, fund, and commercialize the deinking technology. In the proffer to the court without the jury present, this witness testified that Yang came to California to negotiate a deal to set up two organizing companies, one by the name of Enzyme Works, which the witness and others would fund. The witness claimed that during the negotiations Yang referenced that he anticipated that Williamson as legal counsel would receive a five to ten percent "shareholdership." This deal never materialized, and instead Yang formed EDT, which he funded through others.

After hearing the proffered testimony and cross-examination, the court found that the testimony concerned a deal wholly distinct from EDT and thus was irrelevant to the issue of whether Yang promised Williamson five percent of EDT. The court excluded the testimony. As there is evidence to support the determination that the evidence concerned a similar but entirely distinct transaction between Yang and third parties, we discern no abuse of discretion in the court's finding the evidence irrelevant and thus inadmissible.[3]

(b) The court allowed EDT to question Williamson about his not

[1] See OCGA § 16-10-2.
[2] *Piggly Wiggly Southern v. Snowden*, 219 Ga. App. 148, 150 (3) (464 SE2d 220) (1995).
[3] *Dennis v. Dennis*, 227 Ga. 164, 166 (3) (b) (179 SE2d 238) (1971).

filing suit until September 1998, more than two years after his February 1996 demand letter and more than four years after the alleged promise in July 1994. Williamson admitted that he filed suit not long after receiving notice of EDT receiving a patent on the technology. Citing *Turner v. W. E. Pruett Co.*,[4] Williamson contends that the court erred in allowing the testimony in that a delay in filing suit is irrelevant when the suit is filed within the applicable statute of limitation.

The court did not abuse its discretion in allowing the questioning. First, EDT had properly pled that the applicable four-year statute of limitation[5] had run, and there was some evidence that key events occurred more than four years before the suit was filed, thus making this a triable issue. *Turner* held that delay evidence was possibly admissible when the statute of limitation is at issue.[6] The fact that the court had denied a summary judgment motion raising this defense decided nothing except that under the evidence before the court at that time it could not render a judgment deciding the issue as a matter of law;[7] it became an issue for the jury to resolve.

Second, the evidence showed that the five percent agreement was less likely in that Williamson did not pursue his claim until he received notice of the patent. This lent possible credence to EDT's argument that Williamson was fabricating the agreement to benefit from EDT's recently hard-won success. Thus, even if the evidence were irrelevant as to the statute of limitation, it was possibly relevant as to the very existence of the alleged agreement and was therefore admissible on this ground alone.[8] Evidence of doubtful relevance should be admitted with its weight left to the jury.[9]

(c) The court refused to allow Williamson to recount the hearsay statements of a lawyer he consulted pre-suit. As Williamson was explaining at length why he filed suit in 1998, he threw in the statement that in 1996 an attorney told him that Yang had violated federal and state securities laws. The court did not abuse its discretion in holding that such tangential hearsay testimony was not only irrelevant but highly prejudicial.

(d) The court allowed evidence that Williamson demanded an additional five percent based on the alleged promise that he would receive such if he helped Yang obtain the technology license from the university. Williamson claims that this evidence was irrelevant in

[4] 202 Ga. App. 287, 288 (2) (414 SE2d 248) (1991).

[5] OCGA §§ 9-3-26; 9-3-31.

[6] *Turner*, supra, 202 Ga. App. at 288 (2).

[7] *Ellington v. Tolar Constr. Co.*, 142 Ga. App. 218, 221 (1) (235 SE2d 729) (1977).

[8] See *Nottingham Co. v. Resource Materials Corp.*, 210 Ga. App. 128, 131 (2) (435 SE2d 447) (1993) (physical precedent only) (delay in filing may be shown where it pertains to other issues).

[9] *Dept. of Transp. v. Swanson*, 191 Ga. App. 752, 754 (3) (382 SE2d 711) (1989).

that in his suit he did not choose to seek this additional five percent but only the initial five percent. Regardless of what damages Williamson as a matter of tactics eventually chose to pursue, such does not diminish from the fact that Williamson at various times demanded five percent, six percent, and ten percent of EDT's stock. The constantly shifting demands made the existence of a definite agreement less likely and thus were all relevant to the core question of whether Yang and Williamson ever made the five percent agreement pursued by Williamson in the suit. The court did not abuse its discretion in allowing this evidence.

(e) The court allowed evidence showing the price Williamson received when he sold half of his 60,000 shares in January 1995. Williamson argues this evidence was irrelevant to the issue of whether Yang and he had entered into the five percent agreement in July 1994. Williamson's argument is somewhat disingenuous, for in proving his damages his attorney had him testify to this sale as a basis for his valuation of the shares. As shown by Williamson's own testimony, a sale of the shares to a willing buyer is relevant to determining damages.[10] The trial court did not abuse its discretion in allowing the evidence.

(f) Similarly, the court did not abuse its discretion when it allowed Yang to testify as to the current value and finances of EDT. Such also went to show the value of the shares.[11] Moreover, Williamson affirmatively stated he had "[n]o objection" when Yang moved to admit EDT's recent financial statements. He thereby waived his objection to the admission of such evidence.[12]

(g) The court refused to allow Williamson to use a certain interrogatory response to impeach Yang. Before a prior statement can be used to impeach, it must contradict the witness's testimony given on the stand.[13] "Proof of a different but not inconsistent statement would not suffice to raise an issue either as to impeachment or as to substantive use."[14] This is a question of law for the court.[15]

Here Williamson does not dispute that the interrogatory question was different from the question asked at trial. After carefully reviewing the interrogatory response, the court determined that the response, though related to Yang's trial testimony, did not contradict

---

[10] Cf. *Oglethorpe Power Corp. v. Seasholtz*, 157 Ga. App. 723, 724 (1) (278 SE2d 429) (1981) (recent sale of comparable land is relevant in determining damages).

[11] See *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 408 (1) (434 SE2d 450) (1993) (all facts down to time of trial are relevant in determining damages).

[12] See *Dyer v. State*, 233 Ga. App. 770, 771-772 (505 SE2d 71) (1998).

[13] *Hardeman v. MARTA*, 157 Ga. App. 271, 272 (1) (277 SE2d 65) (1981).

[14] (Citations omitted.) *Hopkins v. State*, 167 Ga. App. 811, 814 (1) (307 SE2d 707) (1983).

[15] *Travelers Ins. Co. v. Bailey*, 76 Ga. App. 698, 703 (1) (47 SE2d 103) (1948).

that testimony. Based on our review of the record, we discern no abuse of discretion.[16]

(h) The court disallowed testimony as to whether EDT was paying Yang's legal expenses. Williamson argues that because an EDT corporate bylaw obligated EDT to pay the legal expenses of officers sued for any act taken in connection with the business of EDT, a showing that EDT was paying Yang's expenses would prove that EDT believed that in July 1994, Yang's dealings with Williamson were in connection with EDT's business. Williamson argues that this would show that EDT had ratified Yang's actions and was therefore responsible for those actions. The argument, however, falls apart in light of the jury verdict exonerating Yang. As the jury found Yang did not breach any contract, whether EDT was responsible for his actions is now moot.

(i) The court allowed Yang to testify as to Williamson's minimal contributions to the success of EDT. This testimony was relevant to show whether Williamson abided by the agreement to help start up EDT and to show whether an agreement to give Williamson five percent of the stock was likely in light of what he actually did to earn it. The court did not abuse its discretion in allowing the testimony.

2. Williamson contends the trial court should have granted his motion for mistrial based on the introduction of a statement implying Williamson may have been acting criminally. Citing *Lylerly v. Phillips*,[17] Williamson claims that such testimony served no purpose other than to raise the "odor of criminality" and thus irreparably prejudiced the jury against him.

The granting or refusing of a motion for mistrial is a matter largely within the discretion of the trial court and will not be disturbed unless a mistrial was essential to the preservation of the right to a fair trial.[18] Here the facts amply support the trial court's decision to allow the testimony and to deny the motion for mistrial. Williamson wrote Yang that Williamson was entitled to an additional five percent of EDT as a result of Yang's alleged promise to him in the early fall of 1994 that Yang would give him such if Williamson helped EDT obtain the technology license from the university. At trial, Williamson testified that because ethically he could not directly help EDT obtain the license from his employer, he did not believe he was entitled to the additional five percent but had asserted the claim to gain leverage in negotiations with Yang and EDT. Thus, he was not seeking the additional five percent at trial.

To rebut this testimony that the additional five percent claim

---

[16] See *Hardeman*, supra, 157 Ga. App. at 272 (1).

[17] 188 Ga. App. 566, 569 (1) (373 SE2d 663) (1988).

[18] *Piggly Wiggly Southern*, supra, 219 Ga. App. at 150 (5).

had been dropped as a result of Williamson believing he had not really earned it, Yang introduced statements from a letter sent to Williamson soon after he reasserted the ten percent claim in which Yang's counsel pointed out the criminal implications of an agreement by a state employee to obtain a governmental benefit for a corporation in exchange for personal compensation to the employee. Yang sought to show that the real reason for dropping the claim was this letter highlighting that to be entitled to the additional five percent, Williamson would have had to engage in criminal misconduct. Moreover, the criminal implications of the second five percent agreement would tend to show that the illegal agreement was never made, which would throw doubt on Williamson's veracity and would make less likely that the first five percent agreement was ever made. As the evidence was relevant to these issues, the trial court did not abuse its discretion in allowing the testimony and in denying the motion for mistrial.

3. Williamson claims that the court erred in allowing Yang to make various misstatements in his closing argument. Williamson, however, failed to make any objections to those statements either during the argument or thereafter. "Having failed to object to any erroneous argument below, [Williamson] will not now be allowed to complain because the trial court has had no opportunity to consider the issue."[19]

4. Williamson contends that the court erred in granting the directed verdicts on all the claims against EDT and on the fiduciary claims against Yang. A directed verdict is authorized when there is no conflict in the evidence as to any material issue and the evidence and all reasonable deductions therefrom demand a particular verdict.[20]

The fiduciary claim hinged on the existence of a fiduciary relationship and duty between Yang as the majority shareholder and Williamson as the minority shareholder, which duty was allegedly breached when Yang increased the authorized shares to ten million without informing Williamson. The undisputed evidence showed that at the time the additional shares were authorized,[21] Williamson was not yet a shareholder of EDT. In fact, Williamson's share certificate reflected on its face that ten million shares were authorized. Thus, there was no fiduciary relationship at the time of the actions causing the alleged breach. And because the jury found there was no contract

---

[19] (Citations omitted.) *Gearing v. Etowah Bank*, 240 Ga. App. 449, 450 (2) (523 SE2d 899) (1999).

[20] OCGA § 9-11-50 (a); *Carden v. Burckhalter*, 214 Ga. App. 487, 488 (1) (b) (448 SE2d 251) (1994).

[21] See OCGA § 14-2-1003 for the procedure for amending the articles of incorporation.

for the shares, there is no arguable evidence that Yang owed Williamson any fiduciary duty at the time the additional shares were authorized. The court did not err in granting a directed verdict on this claim.

The court's granting EDT a directed verdict is now moot. EDT was liable only through Yang. As the jury found in Yang's favor on the breach of contract claim, and as no other claims against Yang survived, the claims against EDT have dissipated.[22]

5. Williamson contends that the court erred in failing to compel EDT to pay for the costs of supplying the entire record. Williamson had directed the clerk to include particular parts of the record, including some materials used in discovery disputes and in the summary judgment motion. Unable to determine just how these particular portions of the record would be used on appeal, EDT responded by designating the entire record. Williamson moved the court to compel EDT to pay the $2,439 expended to include the parts of the record additional to that designated by Williamson, which motion the court denied.

"Ordinarily the costs for the record and transcript in an appeal are borne by the appellant. . . ."[23] "The cost of additional portions of a record designated by the appellee that are necessary to complete the record on appeal must be paid by the appellant; only if considered unnecessary on appeal, should the costs be taxed against the appellee."[24] "The trial court's decision [in this regard] will not be reversed absent a manifest abuse of discretion."[25]

Here Williamson designated discovery and summary judgment portions of the record in addition to the pleadings and transcript. This placed EDT in a quandary as to how those record portions would be used and as to how it would rebut same. Evidence thus supported the conclusion that the additional portions of the record were necessary for the appeal. We discern no manifest abuse of discretion in the trial court's decision to place the record costs on the shoulders of the appellant.

These rulings moot the cross-appeal in Case No. A01A0393.

*Judgment affirmed in Case No. A01A0392. Appeal dismissed as moot in Case No. A01A0393. Andrews, P. J., and Eldridge, J., concur.*

---

[22] See generally *LDS Social Svcs. Corp. v. Richins*, 191 Ga. App. 695, 698-699 (2) (382 SE2d 607) (1989) (absent an independent act of negligence, finding of nonliability against person directly responsible for bad acts exonerates those supervising that person).

[23] *Jones v. Spindel*, 239 Ga. 68, 70 (2) (235 SE2d 486) (1977).

[24] (Citations and punctuation omitted.) *Bennett v. Cotton*, 244 Ga. App. 784, 787 (3) (536 SE2d 802) (2000).

[25] *Jones*, supra, 239 Ga. at 71 (2); see *Morris v. Budd*, 226 Ga. App. 455, 458 (4) (486 SE2d 682) (1997).

DECIDED JUNE 11, 2001 —
RECONSIDERATION DENIED JUNE 28, 2001 — 

*Eric T. Johnson*, for appellant.
*Pursley, Howell, Lowery & Meeks, John R. Lowery*, for appellees.